Price, J.
Within the time allotted for the writing of this opinion, it is impossible to notice and dwell upon each of the numerous assignments of error, the same being more than thirty in number. Nor could the expenditure of the time and labor necessary in doing so, be profitable to either the prisoner or the state. The record is very voluminous and contains the plain marks of a stern legal contest from the commencement to the close of the trial, during which many questions were raised for the determination of the trial court; and in instances somewhat frequent, it appears that errors of a technical character occurred, which is not uncommon to a tedious and sharply contested judicial investigation.
We do not find it our duty to enumerate these occurrences at the trial, nor to give them much, if any, weight in arriving at our conclusions.
We find no error in sustaining the state’s demurrer to the plea in abatement. After the accused *408 eliminated from it the charge, that the men composing the jury commission which selected the names, from which the grand and petit jurors were drawn,, were not judicious freehold electors of Hamilton!' county, and perhaps some other questions of fact not, relied upon, the plea raised questions of law which were properly settled on the demurrer.
The law under which the commission was appointed and organized, is a valid law and its provisions were substantially followed in the selection and drawing of the grand jury which indicted the accused, at least so far as disclosed in'the plea in abatement.
We are of opinion also, that he had a legal petit, jury to try his case. It seems that the trial court was. exceedingly careful in respect to the issue of special venires, and where'the sheriff made return that some-whose names were in such venire could not he found,, the prisoner had no right to he heard to impeach such return as was attempted in this case.
Page after page of this great record, swollen by tedious and oft-times fruitless cross-examinations, is. occupied by the names of men called to fill and complete the jury. Very many fell under the defendant’s challenges, and after reading the examination of the jurors who finally composed the panel, we are-constrained to say, that a jury of good and lawful men, as the law demands, was obtained for the trial of the accused, and the court did not err in any ruling-made during the empaneling of the jury.
In short, we find that the indictment was found by a legal grand jury, and that the prisoner was tried by a legal petit jury.
When we roach the consideration of some of the *409 testimony admitted against the plaintiff in error, it becomes necessary to give some preliminary history of the case not found in the opening statement above-given, because it will reflect light upon what we regard as the vital point in the record.
The deceased, Ada M. Geiger, was the wife of the-accused, Frederick Geiger, and the only other member of the family was a little boy about four years of age and named Stephen Geiger. This family resided,, at the time of the killing, on Linn street, in Cincinnati. The husband and father was a worker in a carriage factory and returned home from his work, on the evening of February 12th, about the usual hour for the evening meal, or about 5 :30 to 6 o’clock.. The prisoner stated that after eating supper and. about 7 P. M., he left the house, with everything in. the usual order to visit his mother in another part of the city, and returned about ten o’clock the same-night, when he found his wife had been murdered.. His absence from home during this time was controverted by the state, by strong circumstantial and! perhaps direct evidence.
When found, the wife was lying on the sink in the-kitchen, face downward, her chest resting in or on. the sink, the abdomen on the drain board and the legs, hanging down from the drain board. The body was lifeless. There were several incised wounds upon the neck, head and shoulders, as if made by some pointed or sharp instrument. There were also on the head wounds that indicated the use of some blunt instrument.
From some of these wounds, no doubt, the death of Mrs. Geiger resulted. When her condition was. first made known a number of neighbors went in,, *410 and a call for the police brought several of them to the Geiger residence, and later, the coroner of the county.
The evidence tends to show that the husband was soon suspicioned and closely interrogated by the police that night, and shortly thereafter was taken into custody by the police and locked up for the night. But during the night he was plied with questions while in prison, by divers police officers at different times. They were relentless and untiring in their efforts to converse with and question the prisoner, and but little time was afforded him to rest from their importunities. The police judge and police prosecutor took part'in the visitations, and on the next morning after the murder, it was arranged that the prisoner should be taken from prison to the office of acting chief of police Casey. This was done, and the evidence of Casey shows that there were present in his office at the time, detectives Jackson, McDermott, and Mr. Dunbar, a newspaper man — Mr. Frey of the Post and a number of others. A stenographer had been summoned and was also present. These were all in the room when Geiger was brought in, and he was seated so. as to face the scene that was about to be enacted. When all was ready, Stephen Geiger, the four-year-old son, was brought in and placed on Casey’s knee. The following is what occurred, as narrated by acting chief Casey, as found on page 668 of the record, et seq.:
Q. “I will ask you to state what the boy said.” (Objected to by counsel for defendant, objection overruled and exception.) A. “When I took the boy on my knee, his father, Fred Geiger there, leaned over to him and said to the boy, he will not tell a lie, *411 before I had asked the boy any question.” On mution of the defendant the latter part of the answer was ruled out.
Q. “When was this you have just detailed that Geiger made that remark? ” A. “It was during the examination of him at the office of chief of police, the day after the arrest.”
Q. “ Now at what time was it made by him in reference to the child Stephen being brought in?” A. “It was after the boy was brought into the room and placed on my left knee. ’ ’
Q. “Had you asked the boy any questions at that time?” A. “No, sir.”
Q. “Now just detail the conversation between you and the boy.” (Objected to, overruled and exceptions.) A. “I asked the boy in the presence of his father who sat close to me and facing me, what his name was. He said his name was Stephen Geiger. I asked him how old he was. He said he was four years old. I asked him if his papa and mamma had trouble last night. He said yes. I asked him what papa done to his mamma. He said he cut her. I asked him what he cut her with. He said with the scissors. I asked him where he got the scissors. He said in the sewing basket.”
Q. “ Anything else ? ” A. “ That was about all I can remember. I also asked him if he was afraid and he said, yes.”
Q. “Now, then at the time the child gave this conversation that you have just given us, what did Geiger say?” A. “He said nothing.”
This same scene is described by Ralph Crawford, another police officer who was present, as follows:
Q. “I will ask you if you were present in the of *412 fice of Inspector Casey as acting chief on the day that Stephen Geiger was brought in and the defendant was there?” A. “Yes, sir.”
Q. “Did you see the child brought in?” A.. “Yes, sir.”
Q. “At the time that he was brought in where was Inspector Casey and where was Geiger, the defendant?” A. “I followed them into Inspector Casey’s room. Geiger was sitting just in a chair.. They (Casey and Geiger) were sitting close together.”
Q. “Where was the little boy, Stephen?” A-“Well, immediately he was taken up on Inspector Casey’s lap.”
Q. “Now, then did you hear any conversation that passed between Inspector Casey and the little-boy in presence of the defendant?” (Objected to by defendant.) A. “Yes, sir.” The Court: “It is. admitted only to go to show the conduct of the prisoner at the time.”
Q. ‘ ‘ Now, detail the conversation, if you please. ’ ’" (Objection and exception.) A. “The first that was-said, Geiger started to talk to the boy. Casey told him to wait a moment. Geiger stopped, and then Geiger said, he is my boy and he will not tell a lie, and then Casey asked the little boy his name. He-answered, telling his name, Stephen Geiger. He-then asked him his age. He answered he was four-years old. Then he asked him if he knew that man-sitting there, pointing to Geiger, and he said it was-his papa. Then he asked him if his papa and mamma had any trouble last night. He said yes. He asked', him then what his papa done to his mamma. He said he hit her. He asked him then what- with. The: *413 little boy says scissors, and he asked him where he got the scissors. He said he got them in the •sewing basket. That is about all that I heard and went out.”
Q. “At that time what did Geiger say?” A. “He made no reply.”
The introduction of this conversation was objected to and it was permitted, for the only purpose of showing the conduct of the prisoner.
Was the evidence, under the circumstances and surroundings, competent? This is a grave question, for the evidence could not fail to impress the jury, when placed in connection with other testimony in the case.
It is not claimed by the state that the boy’s statements are evidence, or that he was a competent witness to make statements in or out of court, and he was not called as a witness. The scene was prepared in order to see how the prisoner would conduct himself in the presence and hearing of his boy while the conversation was being had, and what he would say, if anything, concerning it. Hence, Casey, and Crawford, whose testimony we have quoted, said when asked what Geiger said, answered that he said nothing, or made no reply. In short, the state claims that Geiger’s silence when the conversation with the boy ended, was a confession — a confession by silence. We cannot refrain from the observation, that before a court admits this class of confessions, great caution should be exercised to see if the grounds for their admission are clearly laid. It is not every instance of silence in the hearing of accusation that renders it admissible, as admitting guilt. Was the *414 prisoner called upon to speak? And if he attempted to speak did he have permission to do so ?
The conversation was not addressed to him. The meeting at the inspector’s office was all planned be-before he became a part of it. He was not there of his own accord, bnt was in custody of the officers of the law and was taken there to see about him several policemen who had interrogated him the night before, also reporters for newspapers, a stenographer and many others, who were either invited or permitted to be present. To Geiger, whether guilty or innocent, the time and place was awe-inspiring, and to one whose mind was perturbed by the exciting incidents which preceded the meeting, calmness and self-possession would be strangers. To avoid the effect of silence when accusations, or incriminating statements are made in his hearing, must the prisoner in all cases speak and protest? Did the law expect him to contradict or protest against the prattle of his own little child, or bear the presumption that silence is confession of guilt? We cannot think so. The law is not cruel enough to exact that a father, beset as was Geiger at the time and place, should deny the words of his infant child, or brand them as false.
It is said by Greenleaf, in volume 1, section 197, of his work on Evidence: “Admissions may also be implied from the acquiescence of the party. But acquiescence, to have the effect of an admission, must exhibit some act of the mind, and amount to voluntary demeanor or conduct of the party. And whether it is acquiescence in the conduct or in the language of others, it must plainly appear that such conduct was fully known, or the language fully understood by the party, before any inference can be drawn from his *415 passiveness or silence. The circumstances, too, must be not only such as afforded him an opportunity to act or to speak, but such also as would properly and naturally call for some action or reply, from men similarly situated. To affect a party with the statements of others, on the ground of his implied admission of their truth, by silent acquiescence, it is not enough that they were made in his presence; for, if they were given in evidence in a judicial proceeding, he is not at liberty to interpose when and how he pleases, though a party.”
And in .section 198, of same authority: “Nothing, it is said, can be more dangerous than this kind of evidence. It should always be received with caution; and never ought to be received at all, unless the evidence is of direct declarations of that kind which naturally calls for contradiction; some assertion made to the party with respect to his right, which, by his silence, he acquiesces in. A distinction has accordingly been taken between declarations made by a party interested and a stranger; and it has been held that, while what one party declares to the other, without contradiction, is admissible evidence, what is said by a third person may not be so. It may be impertinent, and best rebuked by silence; but if it receives a reply, the reply is evidence. Therefore, what the magistrate, before whom the assault and battery was investigated, said to the parties, was held inadmissible, in a subsequent civil action for the same assault.”
Recurring to the facts connected with the silence of the prisoner it may be said that it was not a judicial inquiry that was being conducted. It surely was not, but to one not versed in legal procedure, it may *416 have made upon his mind the impression that he was undergoing some kind of judicial inquiry — a star-chamber investigation.
When he attempted to speak to his boy, he was told to wait, and he did wait. He was not informed that he had a right to speak, and he was given no opportunity to speak. This appears fairly from the examination of the two police officers called by the state .and from whom we have quoted. While we respect .and admire the skill and assiduity of officers of the law in ferreting out crime and apprehending criminals, and even do not need to condemn the so-called “sweat box,” we cannot be unmindful, of the twofold relation such officers sustain to society. No one who reads this record can conclude it with entire ■complacency and approval of all that led up to the scene of that morning.
The prisoner was in their custody and wholly at their mercy. It was their duty to protect him from mob violence without and from any violation of his legal rights within the prison, or while in their ■charge. The only object in introducing the conversation between Inspector Casey and the little boy, was to get the further fact before the jury that •Geiger said nothing — was silent, — from which the jury might infer guilt. The questions of Casey and answers of the boy could have occupied but a few moments of time. Geiger was neither asked for reply or explanation, nor does it seem that he was given time for either. In the distress and surprise at what was enacted before him, and with a memory of what so recently preceded, he might well have expected a shifting of the scenes, and wait until all was over. He was told to wait and therefore his silence *417 was not voluntary, and it should not count against him.
We have examined the authorities cited pro and con upon this question, but it is unnecessary that we review them here. It is sufficient to say, that we find no case that upholds the admissibility of the evidence we have been considering. It was greatly prejudicial.
It has been said in argument that the lower courts were somewhat influenced in their judgments by the case of Murphy v. State, 36 Ohio St., 628. Even a casual reading of that case will show how plainly it differs from the present issue.
The facts, the entire opinion and the syllabus of that case mark it as one of a very different character'. The two men, with part of the stolen goods on their person, which they were carrying away, were apprehended by a police officer and one, in the presence of the other, made incriminating statements affecting both, and the other remained silent. On the trial of the silent prisoner, the incriminating statements made by the other were properly admitted. So this court decided in that case. It should not be and is not an authority on the facts of the case at bar.
The charge of the court in the main is a correct statement of the law of homicide as applied to the case on trial. But the evidence which we have found improperly admitted being still with the jury, the court felt his duty to give instructions upon the subject, as follows:
“I want to call your especial attention to the statements alleged to have been made in the presence of the defendant by Stephen Geiger, and while Stephen was sitting on the knee of Inspector Casey, in the office of the superintendent of police.
*418 “Such statements were admitted, not as themselves evidence of the truth of the facts stated, but to show the conduct of the defendant at the time, and you, gentlemen of the jury, cannot consider such statements for any other purpose.
“An admission or confession may be implied from the conduct of the party in remaining silent when charged with crime, or when statements are made, by third persons, in his presence, affecting him, when the circumstances surrounding him at the time afford him an opportunity to act or speak in reply, and men similarly situated, would voluntarily deny the implied guilt or make explanation of the Statements.
“The degree of credit you may give to such tacit admission is always to be determined by the jury, under the circumstances of the particular case. Such evidence should be received with caution, and attention should be directed to the defendant, and to the circumstances and conditions surrounding him that would be likely to influence his actions, with a view to determine the motive that induced his silence, if he was silent.
“If it be doubtful whether the statements were perfectly heard or understood by the prisoner, or circumstances existed which might prevent a reply or render it improper or inexpedient to reply, or his silence may be attributable to fear, or any other motive than acquiescence in the truth of the statements to which his silent assent is claimed, the evidence would be entitled to no weight; but its value is to be determined by you, gentlemen of the jury, considering all the circumstances and conditions surrounding him at the time and considering the manner in *419 which such statements were made by little Stephen and the conditions surrounding him.”
The court in this instruction left the weight of the evidence with the jury, making it dependent upon certain facts which should have been found and passed upon by the court, before the dialogue between Casey, the interlocutor, and little Stephen Geiger, was allowed to go to the jury. The court was still treating it as some evidence against the prisoner, but just how much or how strong, the jury were to determine.
If we are right in the views we have already expressed concerinng this evidence, there was but one proper charge respecting it, and that would be a charge ruling it out of the case, and a pointed instruction to give it no consideration whatever. In not doing so, we think the court erred. We have no sympathy with crime or criminals, but the law of a fair trial must be upheld.
For these errors, we reverse the judgments of the lower courts and remand the cause for new trial and further proceedings according to law.

Judgments reversed.

Spear, C, J,, Davis, Shauck and Crew, J J., concur.